**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF** | |
| **TWO IPHONES, A COMPUTER, AND A SECURITY DEVICE LOCATED IN WASHINGTON D.C.** | **Mag. No. _____** |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER**
**RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, **Robert Graves**, a Special Agent with the Federal Bureau of Investigation (hereinafter "your affiant") being duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.      I have been a Special Agent with the Federal Bureau of Investigation since January 11, 2015.  I am currently assigned to the FBI's Violent Crime Task Force which is responsible for investigating violent crimes and major offenders in Washington D.C. During the course of my participation in law enforcement I have conducted arrests and executed search warrants and court orders. I have investigated crimes involving bank robberies, armored car robberies, Hobbs Act violations, extortion/threats, and kidnappings.  As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

3.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant authorizing the examination of two cellular

phones, a computer and a Ledger Blue Personal Security Device which are associated with

SHANE DENNIS BROWNE. The property to be searched (hereafter "Digital Devices") are

described below and in Attachment A; and the extraction from the Digital Devices of

electronically stored information are described in Attachment B. The Digital Devices to be

searched, include:

a.   A black Apple iPhone cellular telephone, FCC ID BCG-E3085A, IC 579C-
E3085A and model number A1660, (hereinafter, "Target Cell Phone #1").

b.   A black Apple iPhone cellular telephone, FCC ID BCG-E3085A, IC 579C-
E3085A and model number A1660, (hereinafter, "Target Cell Phone #2").

c.   A black and red ASUS G20 Republic of Gamers computer, Serial Number:
F1PDCG001BHD (hereinafter, "Target Computer").

d.   A black and grey Ledger Blue Personal Security Device, Serial Number
3760027781241, which is located on the packaging box of the Ledger Blue
Personal Security Device (hereinafter, "Target Security Device").

4.      A Ledger Blue Personal Security Device is a handheld hardware wallet device

that stores cryptocurrency, architected around a secure element, which includes a touchscreen,

USB connection for a computer and smartphone compatibility. The Ledger Blue Personal

Security Device runs multiple apps that can be used with a number of different types of

cryptocurrencies. Cryptocurrencies are virtual currencies that are encrypted using a cryptography

to secure transactions, to control creation of additional units and to verify the transfer of assets.

2

As an initial step in configuration, the software on the Ledger Blue Personal Security Device generates a mnemonic recovery phrase, which is a list of 24 words, and instructs the user to write it down on paper. The mnemonic recovery phrase is used to recover the user's virtual currency in case the Ledger Blue Personal Security Device is lost or requires a reset.

5.      I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, my examination of reports and records, and my conversations with Special Agents of the FBI and other federal law enforcement officers involved in the investigation. I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to obtain a search warrant for the Digital Devices referenced infra.

6.      Based on the information provided in this affidavit, I respectively submit that there is probable cause to believe that kept and concealed in the Digital Devices are evidence, fruits, and/or instrumentalities, described in Attachment B, of the offenses of  kidnapping; using, carrying, possessing and brandishing a firearm during a crime of violence; and distributing and possessing with the intent to distribute a controlled substance, specifically marijuana, in violation of 18 U.S.C. §§ 1201 and 924 and 21 U.S.C § 841.

## RELEVANT STATUTES

7.      Title 18, United States Code, Section 1201(a)(1) (Kidnapping) makes it unlawful for (a) whoever to seize, confine, inveigle, decoy, kidnap, abduct, or carry away and hold for ransom or reward or otherwise any person and (1) the person is willfully transported in interstate or foreign commerce.

8.      Title 18, United States Code, Section 924(c)(1)(A)(ii) (Using, Carrying, Possessing and Brandishing a Firearm During a Crime of Violence) makes it unlawful for (c)(1)(A) for any person who, during and in relation to any crime of violence or drug trafficking crime for which the person may be prosecuted in a court of the United States, uses or carries a firearm or who, in furtherance of any such crime, possesses a firearm, shall in additional to punishment provide for such crime of violence or drug trafficking crime -- (ii) if the firearm is brandished.

9.      Title 21, United States Code, Section 841(a)(1) (Possession with Intent to Distribute a Controlled Substance) makes it (a) unlawful for any person to knowingly or intentionally (1) manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, of dispense, a controlled substance.

## **DEFINITIONS**

10.     Virtual currency is circulated over the Internet as a form of value.  Virtual currency is not issued by any government, bank, or company, but rather is generated and controlled through computer software operating via a decentralized, peer-to-peer network. Bitcoin[1] is a type of virtual currency.  While bitcoin exist primarily as an Internet-based form of currency, it is possible to "print out" the necessary information and exchange bitcoin via physical medium.  Bitcoin is just one of many varieties of virtual currency.

---

[1] Since Bitcoin is both a currency and a protocol, capitalization differs.  Accepted practice is to use "Bitcoin" (singular with an uppercase letter B) to label the protocol, software, and community, and "bitcoin" (with a lowercase letter b) to label units of the currency. That practice is adopted here.

11.     Bitcoin are sent to and received from Bitcoin "addresses."  A Bitcoin address is somewhat analogous to a bank account number and is represented as a 26-to-35-character-long case-sensitive string of letters and numbers.  Each Bitcoin address is controlled through the use of a unique corresponding private key, a cryptographic equivalent of a password or pin needed to access the address.  Only the holder of an address' private key can authorize any transfers of bitcoin from that address to other Bitcoin addresses.

12.     To transfer bitcoin to another address, the payor transmits a transaction announcement, cryptographically signed with the payor's private key, across the peer-to-peer Bitcoin network.  The Bitcoin address of the receiving party and the sender's private key are the only pieces of information needed to complete the transaction.  These two keys by themselves rarely reflect any identifying information.  As a result, little-to-no personally identifiable information about the payor or payee is transmitted in a Bitcoin transaction itself.  Once the payor's transaction announcement is verified, the transaction is added to the blockchain, a decentralized public ledger that records all Bitcoin transactions.  The blockchain logs every Bitcoin address that has ever received a bitcoin and maintains records of every transaction for each Bitcoin address.

13.     To acquire bitcoin, a typical user will purchase them from a Bitcoin "exchanger."[2] Bitcoin exchangers generally accept payments of fiat currency (currency that derives its value from government regulation or law), or other convertible virtual currencies. When a user wishes to purchase bitcoin from an exchanger, the user will typically send payment

---

[2] It is also possible to earn bitcoin by verifying other users' transactions, a process known as "mining."

5

in the form of fiat currency, often via bank wire or ACH, or other convertible virtual currency to an exchanger, for the corresponding quantity of bitcoin, based on a fluctuating exchange rate. The exchanger, usually for a commission, will then either sell the user bitcoin from the exchange's reserves or will attempt to broker the purchase with another user who is trying to sell bitcoin.  The purchased bitcoin are then transferred to the purchaser's Bitcoin address, allowing the user to conduct transactions with other Bitcoin users via the Internet.

14.     Virtual currencies, including Bitcoin, have known legitimate uses.  However, given the ease with which Bitcoin can be used to move funds with high levels of anonymity, Bitcoin have been used to facilitate illicit narcotics transactions and to launder proceeds of narcotics transactions.

## BACKGROUND

15.     Given the capabilities of modern digital devices such as computers, laptops, hard drives, cellular telephones, digital tablets, and "smart phones," your affiant has learned from speaking with FBI Agents who work narcotics that individuals who distribute, controlled substances, including marijuana, often use multiple digital devices in an effort to hide their true identity as well as to store records and data related to the acquisition, possession, and distribution of controlled substances.

16.     Computer hardware, software, passwords, data security devices and data can be integral tools for drug traffickers and money laundering and may constitute the means of committing these and other crimes. Drug traffickers often utilize computers and computer related equipment to keep detailed records of their narcotics transactions. Various computer software

programs originally designed for balancing home finances are often utilized by traffickers to keep track of drug profits and to launder the money earned through illicit narcotics trafficking.

17.     Your affiant has also learned that drug traffickers often communicate with customers, suppliers, and co-conspirators via cellular telephones, specifically smart phones. Drug traffickers use cellular telephones to arrange meetings, request drugs, take drug orders, and arrange for co-conspirators to obtain and distribute drugs. To avoid detection by law enforcement, drug traffickers commonly use more than one cellular telephone and often send text messages, rather than engage in oral communications.

18.     Typical digital evidence stored on digital devices include but are not limited to records of telephone numbers, telephone books, address books, credit cards and hotel receipts and other travel indicia, plane and car rental reservations and receipts, accounts, records in fictitious names, false identifications, and records indicating the existence of storage facilities used in narcotics trafficking.  In addition, your affiant has learned that those engaged in drug trafficking often keep and maintain digital photographs and video that portray themselves, associates, drugs, monies, and other events and persons and objects that are involved in their drug trafficking activities.

19.     Your affiant has also learned that individuals who deal in firearms and firearm related offenses often keep and maintain records related to the acquisition and or possession of firearms and firearm related products as well as maintain documents, receipts, ledgers, tally sheets of sales, lists of clients, related records, and bank documents recording transactions from their firearm.  In addition, your affiant has also learned that those engaged in firearms related offenses often keep and maintain digital photographs and video that portray themselves,

7

associates, firearms, and other events and persons and objects that are involved in their firearms related offenses.

20.     Digital devices can store information for long periods of time and even when a user deletes information from a device; it can sometimes be recovered using forensic tools.

21.     On the basis of my knowledge concerning this investigation, and on the basis of other information which I have reviewed and determined to be reliable, I allege facts to show that there is probable cause to believe that SHANE BROWNE committed a kidnapping with a firearm and unlawfully possessed marijuana with the intent to distribute and there is probable cause to believe that the Digital Devices contain evidence of the kidnapping with a firearm and unlawful distribution of marijuana.

## PROBABLE CAUSE

22.     The complainant in this matter worked as a Lyft driver.  Lyft is a transportation company that matches drivers with passengers who request rides through the Lyft smartphone app.  Passengers pay through use of the app.  The government has learned that the complainant has immigration issues.  The complainant has entered a deferred action process with immigration authorities, and is expected to apply for a U-Visa as a qualifying victim of a violent crime, which will involve certification as to that status by law enforcement.

23.     On December 11, 2017, at approximately 3:22 p.m., the complainant picked up an individual, later identified as SHANE DENNIS BROWNE, from 2401 Calvert Street NW, Washington, D.C.  Before exiting the apartment building at 2401 Calvert Street NW and entering the rear passenger side of the complainant's vehicle, BROWNE had spoken a few minutes earlier by telephone with the complainant, and confirmed the complainant's willingness to provide a

long ride to a location near Baltimore, Maryland.  The ride was provided to BROWNE pursuant to the Lyft app to a designated address in Aberdeen, Maryland.  During the trip, the two spoke to one another on occasion while BROWNE sat in the rear passenger seat, and the complainant heard and saw BROWNE use a cell phone during portions of the ride.  Once at the designated address in Aberdeen, Maryland, at BROWNE's request, the complainant dropped BROWNE off at a nearby McDonald's restaurant.  The complainant indicates that the two parted ways at that point -- with the complainant having indicated he did not wish to provide a return trip for BROWNE -- and that the complainant parked at the McDonald's and used the restroom and obtained a coffee before returning to his parked car to talk on his telephone.

24.     A review of video from the McDonald's restaurant of approximately half an hour's length (in addition to showing the complainant entering to use the bathroom and obtain a coffee before exiting), shows an individual believed to be BROWNE sitting inside the McDonald's for a time before exiting one side of the McDonald's and then returning inside with a suitcase that had not previously been in his possession.  That person believed to be BROWNE is then seen exiting the other side of the McDonald's and walking with the suitcase towards an area where a view of the complainant's car on the video is difficult.

25.     The complainant indicates that BROWNE returned to the car with a suitcase that BROWNE did not have before. After placing a large suitcase in the unlocked trunk of complainant's car, BROWNE entered the rear passenger seat and requested a return trip.  When the complainant refused, BROWNE pulled out a semi-automatic handgun from a smaller bag at his feet, placed it to the complainant's head, and ordered him to drive back to 2401 Calvert

Street, N.W., at gunpoint.  The complainant could feel the handgun and see it in his rear view mirror.  The complainant complied with BROWNE's demand.

26.     On the trip back to D.C. from Aberdeen, the complainant observed BROWNE speaking on his cell phone at various points and also saw through the rear view mirror that BROWNE continued to hold on to the handgun. Without alerting BROWNE, at one point during the return trip the complainant sent an email to Lyft indicating that he needed police assistance.

27.     The parties arrived back at 2401 Calvert Street NW at approximately 7:28 p.m. BROWNE counted off some money and placed approximately $100 in the center console before exiting the vehicle, retrieving his suitcase from the trunk, and entering the apartment building at 2401 Calvert Street NW.

28.     Metropolitan Police Department ("MPD") officers arrived on the scene after the complainant reported what had happened.  After speaking to the complainant and obtaining a description of the suspect, MPD officers, with the help of front desk personnel at the apartment building, reviewed video footage from a camera near the front desk.  A person generally matching the description provided by the complainant was identified as living in a corporate apartment, in apartment #727.  A snap shot of the suspect was taken from the apartment surveillance video which shows the suspect exiting the building.  An officer showed the still shot to the complainant, who indicated that it looked like the suspect based on the clothing that he was wearing. Sometime later the officers learned that the person living in apartment 727 was SHANE BROWNE and they obtained a copy of BROWNE's driver's license that was on file with the apartment building.  Shortly before 9:30 p.m., officers knocked on apartment 727 and after some minutes, BROWNE eventually answered. The Officers detained BROWNE.  A show-

10

up was conducted at approximately 11:09 p.m., and the complainant positively identified

BROWNE as the suspect along with the coat that BROWNE was wearing.

29. At the time of his arrest, BROWNE was found to be in possession of Cellular

Telephones #1 and #2, which were seized as evidence in anticipation of this application for a

search warrant. After waiving his *Miranda* rights, BROWNE spoke to detectives and among

other things admitted taking a Lyft ride to and from Aberdeen, Maryland; obtaining a suitcase at

a McDonald's restaurant in Aberdeen; and that his cellular telephone number is 202-308-2369.

BROWNE stated that he paid cash for the return trip and denied forcing the driver to give him a

ride at gunpoint. Subsequent investigation determined that a fingerprint impression lifted from

the complainant's external passenger door matched one of the known fingerprints of BROWNE.

30. On or about December 12, 2017, two D.C. Superior Court search warrants were

executed at 2401 Calvert Street Northwest Apt. 727, Washington, D.C. During the searches,

MPD found and seized suitcases and a plastic bin containing multiple sealed bags of a green

leafy substance, in what appeared to look and smell like marijuana; a glass pipe with an

unknown residue; a coffee grinder; a Food Saver plastic seal machine; a money counter; the

Target Computer and Target Security Device as well as approximately $35,575 in cash. In total,

MPD seized approximately 81 bags containing a green leafy substance, in what appeared to look

and smell like marijuana. The Target Security Device was also found inside a product box

which contained a white piece of paper that listed in the upper right hand corner "0852 PIN" and

a "My Recovery Phrase", which listed a set of 24 words, which is consistent with mnemonic

recovery phrase.

31.     On or about December 14, 2017, a federal Grand Jury returned an indictment of BROWNE, charging him with one count of kidnapping, in violation of 18 U.S.C. § 1201(a)(1) and one count of using, carrying, possessing, and brandishing a firearm during a crime of violence, in violation of  18 U.S.C. § 924(c)(1)(A)(ii).   On or about February 27, 2018, the federal grand jury returned a superseding indictment that charged BROWNE with the same counts, as well as additional counts concerning the following violations:  Possession with Intent to Distribute Marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D); Kidnapping While Armed (Firearm or Imitation Thereof), in violation of 22 D.C. Code §§ 2001 and 4502 (2001 ed.); Assault with a Dangerous Weapon (Firearm or Imitation Thereof), in violation of 22 D.C. Code § 402; and Possession of a Firearm or Imitation Thereof During a Crime of Violence, in violation of 22 D.C. Code § 4504(b).  In addition, the superseding indictment contains a forfeiture allegation concerning proceeds relevant to the Possession with Intent to Distribute Marijuana Count, including the approximately $35,575 in currency found during the execution of the search warrants at BROWNE's apartment.  The case, *United States v. Shane Browne*, 17-CR-00241(TNM), has been set for a trial date of April 9, 2018.

32.     On or about November 13, 2017, BROWNE checked into the Calvert House Apartment. On his check-in documentation BROWNE listed his telephone number as 202-308-2369, and his emergency contact number as 703-615-8688.

33.     On or about November 14, 2017, BROWNE applied for a Mail Box rental from Parcel Plus. On the Parcel Plus application BROWNE listed his phone number as 202-308-2369, his California Driver's License Number as D1995582, his passport number as 450400243, his

delivery address as 3509 Connecticut Ave NW #1098, Washington D.C., which is the address of

Parcel Plus, and his home address as 9663 Santa Monica Blvd., Beverly Hills, CA 90210.

34.     Open source checks of social media indicate that SHANE BROWNE listed his

phone number as 202-308-2369, 213-281-8657, 310-883-5369, and 917-808-1183; and his email

address as shanedennisBROWNE@gmail.com and BROWNE9@gmail.com.  In addition,

records obtained from Lyft indicate that the Lyft ride which BROWNE took with the

complainant to Aberdeen, Maryland, was obtained through a Lyft account in the name of Shane

Browne using the email address of shanedennisbrowne@gmail.com.

35.     Target Cell Phone #1 and #2 are currently in the lawful possession of the District

of Columbia Metropolitan Police Department (MPD) and stored at located at the Evidence

Control Branch, 17 DC Village Lane, SW, Washington, DC. Target Cell Phone #1 and #2 came

into MPD's possession subsequent to the arrest of SHANE DENNIS BROWNE on or about

December 11, 2017 and have been in the care and custody of MPD since the seizure.

36.     The Target Computer and Target Security Device are currently in the lawful

possession of the Federal Bureau of Investigation and stored at located at the Federal Bureau of

Investigation, Washington Field Office, Washington, D.C. The Target Computer and Target

Security Device were seized during the execution of a search warrant by MPD at BROWNE's

residence located at 2401 Calvert Street, Apt #727 NW, Washington, D.C on or about December

12, 2017.

37.     The suspected marijuana was submitted to the Special Testing and Research

Laboratory of the Drug Enforcement Administration in Dulles, Virginia.  The lab determined

that there was in fact a detectable amount of marijuana, and that the total net weight of the

submitted exhibits was a little more than 75 pounds,   Based on this amount of marijuana found in BROWNE's apartment, and based on your affiant's experience and consultation with other agents who are familiar with drug enforcement, your affiant understands that this amount of marijuana is consistent with the intent to distribute.  In addition, your affiant would note that the complainant heard BROWNE speaking on a cell phone to one or more other persons at various points during the drive to and from Aberdeen, Maryland.  Among other things, the complainant indicates that he overheard BROWNE talk about some manner of encrypting his emails, and indicating that another person would be able to take over his business if he (BROWNE) were to be sent to jail.  Given these snippets of overheard conversation, the amount of suspected marijuana inside of BROWNE's apartment, and the large amount of currency found within BROWNE's apartment along with a cash counting machine, your affiant believes that there is probable cause to believe that BROWNE is involved in illicit drug trafficking and that his "business" involves such illicit drug trafficking.  Given that drug traffickers often use more than one cell phone to engage in their trafficking and often use phones and computers and bitcoins in furtherance of their drug trafficking as described in more detail in the "Background" section above and below, your affiant believes that there is probable cause to believe that the digital devices described in Attachment A contain items described in Attachment B.

## **TECHNICAL TERMS**

38.    Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.      "Digital device," as used herein, includes the following three terms and their respective definitions:

1)      A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.  *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)      "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications devices

15

such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

      b.     "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities.  These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

      c.     A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen.  Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise.  Tablets typically contain programs called applications ("apps"), which, like programs on both

wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

        d.      A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

        e.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

g.      Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.      The Internet is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.  ISPs typically

charge a fee based upon the type of connection and volume of data, called bandwidth, which the

connection supports.  Many ISPs assign each subscriber an account name, a user name or screen

name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber.

By using a modem, the subscriber can establish communication with an ISP and access the

Internet by using his or her account name and password.

        j.      A "modem" translates signals for physical transmission to and from the

ISP, which then sends and receives the information to and from other computers connected to the

Internet.

        k.      A "router" often serves as a wireless Internet access point for a single or

multiple devices, and directs traffic between computers connected to a network (whether by wire

or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its

client machines and sends out requests on their behalf.  The router also distributes to the relevant

client inbound traffic arriving from the Internet.  A router usually retains logs for any devices

using that router for Internet connectivity.  Routers, in turn, are typically connected to a modem.

        l.      "Domain Name" means the common, easy-to-remember names associated

with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of

149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level

delimited by a period.  Each level, read backwards – from right to left – further identifies parts of

an organization.  Examples of first-level, or top-level domains are typically .com for commercial

organizations, .gov for the governmental organizations, .org for organizations, and, .edu for

educational organizations.  Second-level names will further identify the organization, for

example usdoj.gov further identifies the United States governmental agency to be the

Department of Justice.  Additional levels may exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

      m.    "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website.

      n.    "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet.  In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software.  A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network.  A P2P file transfer is assisted by reference to the IP addresses of computers on the network:  an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers.   One aspect of P2P file sharing is that multiple files may be downloaded at the same time.  Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

      i.    When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software.  The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

20

ii.      Third party software is available to identify the IP address of a P2P

computer that is sending a file.  Such software monitors and logs Internet and

local network traffic.

o.      "VPN" means a virtual private network.  A VPN extends a private

network across public networks like the Internet.  It enables a host computer to send and receive

data across shared or public networks as if they were an integral part of a private network with

all the functionality, security, and management policies of the private network.  This is done by

establishing a virtual point-to-point connection through the use of dedicated connections,

encryption, or a combination of the two.  The VPN connection across the Internet is technically a

wide area network (WAN) link between the sites.  From a user perspective, the extended

network resources are accessed in the same way as resources available from a private network-

hence the name "virtual private network."  The communication between two VPN endpoints is

encrypted and usually cannot be intercepted by law enforcement.

p.      "Encryption" is the process of encoding messages or information in such a

way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption

scheme, the message or information, referred to as plaintext, is encrypted using an encryption

algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an

encryption key, which specifies how the message is to be encoded.  Any unintended party that

can see the ciphertext should not be able to determine anything about the original message.  An

authorized party, however, is able to decode the ciphertext using a decryption algorithm that

usually requires a secret decryption key, to which adversaries do not have access.

q.      "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems.  It can appear in the form of code, scripts, active content, and other software.  Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

39.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I know that the Device Target Cell Phone #1, a black Apple iPhone cellular telephone, FCC ID BCG-E3085A, IC 579C-E3085A and model number A1660 and Target Cell Phone #2, a black Apple iPhone cellular telephone, FCC ID BCG-E3085A, IC 579C-E3085A and model number A1660 have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offense under investigation.

40.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I know that the Device Target Computer, a black and red ASUS G20 Republic of Gamers computer, Serial Number: F1PDCG001BHD has capabilities that allow it to serve as a desktop computer, digital storage media, computer hardware, computer software and wireless data network.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by

22

implication who did not, as well as evidence relating to the commission of the offense under investigation.

41.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I know that the Device Target Security Device, a black and grey Ledger Blue Personal Security Device, Serial Number 3760027781241 has capabilities that allow it to serve as a handheld hardware wallet device with USB and Bluetooth connectivity.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offense under investigation.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

42.     As described above and in Attachment B, this application seeks permission to search for information that might be found within the Devices.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the Devices for at least the following reasons:

        a.     Individuals who engage in criminal activity use digital devices, like the Devices, to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store on digital devices, like the Devices, documents and records relating to their illegal activity, which can include logs of online "chats" with co-conspirators; email

correspondence; text or other "Short Message Service" ("SMS") messages; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; stolen financial and personal identification data, including bank account numbers, credit card numbers, and names, addresses, telephone numbers, and social security numbers of other individuals; and records of firearms purchases and illegal transactions using stolen financial and personal identification data, to, among other things, (1) keep track of co-conspirator's contact information; (2) keep a record of illegal transactions for future reference; (3) keep an accounting of illegal proceeds for purposes of, among other things, splitting those proceeds with co-conspirators; and (4) store stolen data for future exploitation.

b.    Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.    Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not

24

allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

43.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used

it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.    Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs,

26

photographs, the presence or absence of malware, and correspondence (and the data associated

with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or

controlled the digital device at a relevant time, and potentially who did not.

   c. A person with appropriate familiarity with how a computer works can, after

examining this forensic evidence in its proper context, draw conclusions about how computers

were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact files, blocks, registry entries, logs, or

other forms of forensic evidence on a digital device that are necessary to draw an accurate

conclusion is a dynamic process.  While it is possible to specify in advance the records to be

sought, digital device evidence is not always data that can be merely reviewed by a review team

and passed along to investigators.  Whether data stored on digital devices is evidence may

depend on other information stored on the devices and the application of knowledge about how

the devices behave.  Therefore, contextual information necessary to understand other evidence

also falls within the scope of the warrant.

   e. Further, in finding evidence of how a digital device was used, the purpose of

its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not

present on the device.  For example, the presence or absence of counter-forensic programs, anti-

virus programs (and associated data), and malware may be relevant to establishing the user's

intent and the identity of the user.

   f. I know that when an individual uses a digital device in furtherance of a

crime, the individual's device will generally serve both as an instrumentality for committing the

crime, and also as a storage medium for evidence of the crime.  The digital device is an

instrumentality of the crime because it is used as a means of committing the criminal offense.

The digital device is also likely to be a storage medium for evidence of crime.  From my training

and experience, I believe that a digital device used to commit a crime of this type may contain

data that is evidence of how the digital device was used; data that was sent or received; notes as

to how the criminal conduct was achieved; records of Internet discussions about the crime; and

other records that indicate the nature of the offense and the identities of those perpetrating it.

### METHODS TO BE USED TO SEARCH DIGITAL DEVICES

44.    Based on my knowledge, training, and experience, as well as information related

to me by agents and others involved in this investigation and in the forensic examination of

digital devices, I know that:

a.    Searching digital devices can be an extremely technical process, often

requiring specific expertise, specialized equipment, and substantial amounts of time, in part

because there are so many types of digital devices and software programs in use today.  Digital

devices – whether, for example, desktop computers, mobile devices, or portable storage devices

– may be customized with a vast array of software applications, each generating a particular form

of information or records and each often requiring unique forensic tools, techniques, and

expertise.  As a result, it may be necessary to consult with specially trained personnel who have

specific expertise in the types of digital devices, operating systems, or software applications that

are being searched, and to obtain specialized hardware and software solutions to meet the needs

of a particular forensic analysis.

b.    Digital data is particularly vulnerable to inadvertent or intentional

modification or destruction.  Searching digital devices can require the use of precise, scientific

28

procedures that are designed to maintain the integrity of digital data and to recover "hidden,"

erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic

files from digital devices also requires specialized tools and often substantial time.  As a result, a

controlled environment, such as a law enforcement laboratory or similar facility, is often

essential to conducting a complete and accurate analysis of data stored on digital devices.

       c.     Further, as discussed above, evidence of how a digital device has been used,

the purposes for which it has been used, and who has used it, may be reflected in the absence of

particular data on a digital device.  For example, to rebut a claim that the owner of a digital

device was not responsible for a particular use because the device was being controlled remotely

by malicious software, it may be necessary to show that malicious software that allows someone

else to control the digital device remotely is not present on the digital device.  Evidence of the

absence of particular data or software on a digital device is not segregable from the digital device

itself.  Analysis of the digital device as a whole to demonstrate the absence of particular data or

software requires specialized tools and a controlled laboratory environment, and can require

substantial time.

       d.     Digital device users can attempt to conceal data within digital devices

through a number of methods, including the use of innocuous or misleading filenames and

extensions.  For example, files with the extension ".jpg" often are image files; however, a user

can easily change the extension to ".txt" to conceal the image and make it appear that the file

contains text.  Digital device users can also attempt to conceal data by using encryption, which

means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the

data into readable form.  Digital device users may encode communications or files, including

substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby

thwarting "keyword" search techniques and necessitating continuous modification of keyword

terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend

themselves to keyword searches.  Some applications for computers, smart phones, and other

digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-

text format.  Documents printed by a computer, even if the document was never saved to the

hard drive, are recoverable by forensic examiners but not discoverable by keyword searches

because the printed document is stored by the computer as a graphic image and not as text.  In

addition, digital device users can conceal data within another seemingly unrelated and innocuous

file in a process called "steganography."  For example, by using steganography a digital device

user can conceal text in an image file that cannot be viewed when the image file is opened.

Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are

not scrupulously followed.  A substantial amount of time is necessary to extract and sort through

data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence,

contraband or instrumentalities of a crime.

      e.      Analyzing the contents of mobile devices, including tablets, can be very

labor intensive and also requires special technical skills, equipment, and software.  The large,

and ever increasing, number and variety of available mobile device applications generate unique

forms of data, in different formats, and user information, all of which present formidable and

sometimes novel forensic challenges to investigators that cannot be anticipated before

examination of the device.  Additionally, most smart phones and other mobile devices require

passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type

of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

      f.    Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

      g.    In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

31

1.      The digital devices, and/or any digital images thereof created by law enforcement in aid of the examination and review, will be examined and reviewed by law enforcement personnel, sometimes with the aid of a technical expert, in an appropriate setting, in order to extract and seize the information, records, or evidence described in Attachment B.

2.      The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

3.      In searching the digital devices, the forensic examiners may examine as much of the contents of the devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.  Any search techniques or protocols used in searching the contents of the digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

## AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT

45.     Because forensic examiners will be conducting their search of the digital devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

## CONCLUSION

46.     Based on your affiant's training and experience, our affiant believes a search of Digital Devices may reveal evidence pertaining to BROWNE's violation of 18 U.S.C. §§ 1201 and 924 and 21 U.S.C § 841.  Your affiant submits that his affidavit support probable cause for a search warrant authorizing the examination of search the digital devices described in Attachment A and to seize the items described in Attachment B.

Respectfully submitted,

_____

Robert Graves
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on March _____, 2018:

_____

Robin M. Meriweather
UNITED STATES MAGISTRATE JUDGE

33